Andrew M. Morse (4498)
Adam M. Pace (14278)
Snow Christensen & Martineau
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, Utah 84145
(801) 521-9000
amm@scmlaw.com
amp@scmlaw.com

Bradley R. Hansmann, (Admitted Pro Hac Vice)
Daniel P. Hunkins (Admitted Pro Hac Vice)
800 Market Street, Suite 1100
St. Louis, Missouri 63101-2501
(314) 421-340
(314) 421-3128 – FAX
bhansmann@bjpc.com
dhunkins@bjpc.com
*Attorneys for Defendant Cobalt Boats, LLC*
*and AWS Boats, LLC*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re: the Complaint and the Petition of the United States of America in a Cause for Exoneration from or Limitation of Liability with Respect to National Park Service and Public Vessels Buoy Tender No. 450, No. 257, No. 2510, No. 256, No. 2511, and No. 290 Re: The Grounding of a 21' Speedboat in or near Bullfrog Bay on Lake Powell, Utah, on July 24, 2016. | In Admiralty<br><br>COBALT BOATS, LLC'S AND AWS BOATS, LLC'S JOINT MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT<br><br>[FED. R. CIV. P. 56(a)]<br><br>Case No: 4:18CV65 DN PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

# TABLE OF CONTENTS

**Introduction and Relief Sought** ........................................................................ 6

**Background** ........................................................................................................ 6

**Statement of Undisputed Material Facts** ......................................................... 8

**Law and Argument** .......................................................................................... 12

    **I.**    **Summary judgment standard** ............................................... 12

    **II.**   **Jeffrey Darland's negligent acts and omissions on July 24, 2016 were the sole cause of the accident** ............................................. 14

        *a.*   *Mr. Darland was an experienced boater at the time of the accident, was familiar with Lake Powell, and was familiar with the dangers associated with traveling outside the marked navigational channel* ....... 15

        *b.*   *Renting the Vessel from All-In Boat Rentals* ............................................ 16

        *c.*   *The 105 mile voyage on Lake Powell* ....................................... 17

        *d.*   *The July 24, 2016 Accident* ...................................................... 17

        *e.*   *Mr. Darland was not a prudent mariner on July 24, 2016* ...................... 19

    **III.**  **The Vessel was not defective, was not unreasonably dangerous, and did not cause or contribute to cause the accident** ............................................ 21

        *a.*   *None of the fact witness claim the Vessel caused or contributed to cause the accident* ...................................................... 23

        *b.*   *No expert witness has claimed that the Vessel was defective or that it caused or contributed to cause the accident* ........................................... 23

*c.*     *The Vessel conformed with all applicable government and industry standard* ................................................................................................ 25

**Conclusion** ................................................................................................ 28

**Appendix of Evidence** ................................................................................ 33

# TABLE OF AUTHORITIES

**I.    Cases**

*Huskey v. Trujillo*, 302 F.3d 1307 (Fed.Cir.2002)............................................................ 12

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986) ................................. 13

*United Steelworkers of Am. v. Phelps Dodge Corp*, 865 F.2d 1539 (9th Cir. 1989) ................... 13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................................... 13

*Balint v. Carson City*, 180 F3d 1047 (9th Cir. 1999) ....................................................... 13

*Jones v. United States*, 936 F.3d 318 (5th Cir. 2019)....................................................... 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 14

*Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646 (5th Cir.1992) ............................ 14

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987) .............. 14

*Niemela v. Imperial Mfg., Inc.*, 2011 UT App 333, ¶ 8, 263 P.3d 1191 .................................. 22, 24

*Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, ¶ 10, 264 P.3d 752 ....................................... 24

*Blank v. Garff Enterprises Inc.*, 2021 UT App 6, ¶¶ 29-30, 482 P.3d 258 .................................... 24

*Allen v. Minnstar,* 8 F.3d 1470 (10th Cir. 1993) ...................................................... 25, 26, 27

*Elliott v. Brunswick Corp*, 903 F.2d 1505 (11th Cir. 1990)...................................................... 26, 27

*Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir. 1991) ......................................................... 26

*Peterson v. Raymond Corp.*, 994 F.3d 1224, 1226 (10th Cir. 2021) ............................................ 26

**II.    Statutes**

46 U.S.C. §30505.................................................................................................... 6

46 U.S.C. §31106...................................................................................................... 7

Utah Code Ann. § 78B–6–703(1) (2008).............................................................................. 22

## III.    Rules

Federal Rules of Civil Procedure 56 ........................................................................................ 6, 12, 13

10A Fed. Prac. & Proc. Civ. § 2725 (4th ed.) .......................................................................... 12, 13

Inland Navigation Rules – Rule 5 ............................................................................................. 20, 21

Inland Navigation Rules – Rule 6 ................................................................................................... 20

## INTRODUCTION AND RELIEF SOUGHT

Under Fed. R. Civ. 56(a), Cobalt Boat, LLC ("Cobalt") and AWS Boats, LLC ("AWS") move for summary judgment on the basis that there is no evidence that the 2006 Cobalt Model 10 Series 200 (HIN: US-FGE20038G507) ("Vessel") involved in this accident which was manufactured, sold and/or distributed by Cobalt and AWS was defective or unreasonably dangerous at the time of the accident. Further, there is no evidence to support a finding that the Vessel caused or contributed to cause the accident at issue. Rather, after the close of all discovery, including expert discovery, the only available evidence points fault at parties other than Cobalt and AWS. Accordingly, pursuant to Fed. R. Civ. 56(a) and as set forth in greater detail below, Cobalt and AWS are entitled to summary judgment on all claims arising out of the July 24, 2016 accident.

## BACKGROUND

The action arises out of a July 24, 2016 single vessel accident wherein its captain Jeffrey Darland struck a partially submerged island on Lake Powell in Bullfrog Bay. The grounding occurred at night, after Mr. Darland admittedly consumed alcohol throughout the day, and while he was traveling approximately 25-30 mph. The grounding occurred far outside the marked channel for safe passage.  At the time of the grounding, an intoxicated Jennifer Decker and three minor children, G.D., D.D., and B.D., were aboard the Vessel. As a result of the grounding, all three minor children were ejected from the Vessel, resulting in the amputation of D.D.'s leg and arm, among other injuries. Mr. Darland has since passed away, unrelated to the accident at issue in this case.

This action was initiated through the filing of a Limitation Complaint by the United States of America (hereinafter "United States"), pursuant to 46 U.S.C. §30505 (commonly referred to as the "Limitation of Liability Act" or "LOLA") and 46 U.S.C. §31106 (commonly referred to as the "Public Vessels Act" or "PVA").  Numerous parties have filed claims in this action, including but not limited to, Cobalt, AWS, Brunswick, the Estate of Jeffrey Darland, Tara Gagliardi (mother of D.D. and G.D.), and Paul Theut, Guardian ad Litem for minor D.D. and G.D. ("Theut").

Theut and Gagliardi have also filed a lawsuit against Cobalt, AWS, Brunswick and the Estate of Jeffrey Darland in Maricopa County Superior Court in the State of Arizona arising out of this same accident.  Theut and Gagliardi allege liability on theories of product negligence, product liability and breach of express and/or implied warranty.  After Cobalt and AWS entered into the present action, the United States' filed claims against Cobalt and AWS that mirrors and adopts Theut and Gagliardi's claims in the case pending in Maricopa County Superior Court, Arizona. [ECF 225 and 226]. More specifically, the United States claims that any alleged damages were the proximate result of Cobalt's and/or AWS's fault, negligence, acts, omissions, and breaches of duty in the following respects: failure to properly and safely design, install, inspect and label the Vessel, its propulsion system and any safety mechanisms and component parts; by its failure to provide the Vessel with a non-defective and reasonably safe propeller system and safety guard for the propellers; by its failure to properly label and/or supply warning labels and other appropriate or adequate warnings and instructions to prevent the accident; and by its failure to use and/or adopt a reasonable alternative design which could have reduced or eliminated the foreseeable risk of harm, the omission of which rendered the product not reasonably safe. [ECF 225 and 226]. The same parties are involved in both the present action, and that pending in

Maricopa County Superior Court in the State of Arizona. The issues are the same, and were actively litigated.

After the close of all discovery, including expert discovery, there is not a single piece of evidence proffered by any party that supports a finding that the Vessel was defective, that the Vessel was unreasonably dangerous, or that Cobalt's or AWS' fault, negligence, act, omission, or breaches of duty, if any, caused or contributed to cause the accident at issue. Further, not a single expert has offered an alternative, safer design that existed at the time of the accident that would have prevented the accident. Accordingly, summary judgment is proper for Cobalt and AWS for the claims arising out of the July 24, 2016 accident.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On June 24, 2016, approximately one month prior to the accident, Mr. Darland rented the Vessel from All-In Boat Rentals. (Exhibit 1, 223:9-24).

2.      Mr. Darland walked around and inspected the Vessel with representatives of All-In Boat Rentals. (Exhibit 1, 231:2-232:18).

3.      During his June 24, 2016 trip to Lake Powell, Mr. Darland operated the Vessel in and out of Bullfrog Bay approximately four to five times. (Exhibit 1, 117:1-22).

4.      Mr. Darland had many trips to Lake Powell before renting the Vessel from All-In Boat Rentals. (Exhibit 1, 224:15-18).

5.      Mr. Darland operated in the Bullfrog Bay area at least a couple times before renting the Vessel from All-In Boat Rentals. (Exhibit 1, 224:22-25).

6.      On July 24, 2016, Mr. Darland rented the Vessel again from All-In Boat Rentals, launching it at approximately 1:30 PM (MDT). (Exhibit 1, 138:14-139:2)

7.      Mr. Darland choose not to purchase a Lake Powell map from All-In Boat Rentals, despite it being offered to every customer. (Exhibit 4, 39:4-15).

8.      Mr. Darland does not think safe boating practice includes utilizing a map so that you are familiar with where you are and what the conditions are. (Exhibit 1, 68:5-8).

9.      Mr. Darland choose not to perform any research on Lake Powell to identify navigational hazards. (Exhibit 1, 311:6-12).

10.     Mr. Darland admitted to consuming alcohol from the time he picked up the Vessel at 1:30 PM (MDT) until he left his friends at Seven-Mile Canyon at approximately 9:00 PM (MDT). (Exhibit 1, 197:12-198:17).

11.     It was typical for Mr. Darland to drink six to eight beers while on the water. (Exhibit 1, 199:10-20).

12.     Before the accident, Mr. Darland knew there were submerged or partially submerged features of Lake Powell outside of the designated channel. (Exhibit 1, 72:1-8).

13.     Before the accident, Mr. Darland knew that hazards change from day to day with the water level. (Exhibit 1, 243:21-244:2).

14.     Mr. Darland knew that a lot of hazards on Lake Powell were not marked. (Exhibit 1, 246:9-13).

15.     Mr. Darland knew that operators should slow their boats down when visibility was a concern, including darkness. (Exhibit 1, 65:9-66:10)

16.     Mr. Darland believes that if it is dark and you cannot see, a safe speed would be 10-15 mph. (Exhibit 1, 250:8-11).

17.     Before the accident, Mr. Darland knew that operators of a boat needed to be very careful on Lake Powell given the size of the lake and the amount of shallow water hazards. (Exhibit 1, 244:3-9)

18.     Before the accident, Mr. Darland knew that operators of a boat needed to keep a careful look-out on Lake Powell given the size of the lake and the amount of shallow water hazards. (Exhibit 1, 244:3-9).

19.     Mr. Darland knew that safe speed depended on whether he was in a designated channel. (Exhibit 1, 65:14-17).

20.     Mr. Darland believes safe boating practice includes utilizing the navigational aids that are provided on the lake. (Exhibit 1, 68:2-4).

21.     Mr. Darland was traveling between 25-30 miles per hour at the time of the accident. (Exhibit 1, 142:23-143:7).

22.     Mr. Darland left his friends at the houseboat in Seven Mile Canyon at approximately 9:00 PM (MDT). (Exhibit 1, 143:18-144:2).

23.     The accident occurred at approximately 9:30 PM (MDT) in Bullfrog Bay. (Exhibit 1, 143:18-144:2).

24.     The sun set on July 24, 2016 at approximately 8:41 PM (MDT). (Exhibit 5, pg. 4).

25.     The Aids to Navigation ("ATONs") on Lake Powell are red and green buoys that mark the safe navigational channel on Lake Powell. (Exhibit 3, 21:10-18).

26.     Mr. Darland knew and understood that the ATONs marked the main channel on Lake Powell. (Exhibit 1, 79:1-10).

27.     Utilizing only the ATON system on the night of July 24, 2016, Ranger Dallemolle was able to safely navigate from Hall Crossing, through the main channel and through Bullfrog Bay in order to respond to this accident. (Exhibit 3, 34:22-35:18).

28.     Ranger Dallemolle testified that the ATONs in Bullfrog Bay were lit when he responded to this accident on July 24, 2016. (Exhibit 3, 53:12-23).

29.     Ranger Dallemolle testified that the ATONs in Bullfrog Bay were on station when he responded to this accident on July 24, 2016. (Exhibit 3, 53:12-23).

30.     Mr. Darland had no issues with the Vessel. (Exhibit 1, 118:14-21).

31.     Mr. Darland was comfortable operating the Vessel. (Exhibit 1, 118:14-21).

32.     Mr. Darland did not have any complaints with the way the Vessel ran. (Exhibit 1, 118:14-21).

33.     Mr. Darland believes the Vessel was in good condition. (Exhibit 1, 233:25-234:3).

34.     Mr. Darland believes that the Vessel had all the equipment necessary for safe operation. (Exhibit 1, 233:25-234:3).

35.     Mr. Darland testified that he did not think there was anything wrong with the Vessel that led to the accident. (Exhibit 1, 234:7-10).

36.     The Vessel complied with all industry standards promulgated by National Marine Manufacturers Association ("NMMA") and American Boat and Yacht Counsel ("ABYC"). (Exhibit 5, pg. 16-29).

37.     The Vessel's stern drive and propeller are appropriate for use with the Vessel, and are not unsafe when used in conjunction with safe boating practices. (Exhibit 5, pg. 16-29).

38.     The existence and placement of the propeller was conspicuous and expected for the average consumer. (Exhibit 5, pg. 16-29).

39.     The hazard of spinning propeller is obvious. (Exhibit 5, pg. 16-29).

40.     Jennifer Decker was aware of the fact that boat propellers are sharp. (Exhibit 2, 127:8-12).

41.     Jennifer Decker was aware of the fact that boat propellers rotate very rapidly. (Exhibit 2, 126:24-127:7)

42.     Jennifer Decker was aware of the fact that when rotating, a boat propeller can cause injury. (Exhibit 2, 127:22-25).

43.     There are no prohibitions by manufacturers, Chapman's NMMA, ABYC, or the USCG concerning the seated occupation of open bow seating areas when the boat is underway above planning speed. (Exhibit 5, pg. 16-29).

44.     Visibility from the helm of the Vessel was compliant with ABYC H-1 and as such the Vessel and its equipment did not pose any obstruction to operator's visibility. (Exhibit 5, pg. 16-29).

45.     The Vessel's owner's manual discusses operator responsibility, including information about navigation aids, safe seating, handrail use, visibility, nighttime operation, high speed operation, and hazards with operating under the influence of drugs or alcohol. (Exhibit 5, pg. 16-29).

46.     The Vessel was affixed with warnings labels throughout that complied with guidelines supplied by ABYC. (Exhibit 5, 16-29).

## LAW AND ARGUMENT

**I.   SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where the only issue to be decided is an issue of law.

*Huskey v. Trujillo*, 302 F.3d 1307, 1310 (Fed.Cir.2002) (citing *Dana Corp. v. United States*, 174

F.3d 1344, 1347 (Fed.Cir.1999)). *See also*, 10A Fed. Prac. & Proc. Civ. § 2725 (4th ed.) ("It

necessarily follows from the standard set forth in [Fed. R. Civ. P. 56] that when the only issues to

be decided in the case are issues of law, summary judgment may be granted.")

Additionally:

> The fact that difficult questions of law exist or that the parties differ on the legal
> conclusions to be drawn from the facts is not in and of itself a ground for denying
> summary judgment inasmuch as refusing to grant the motion does not obviate the
> court's obligation to make a difficult decision; a denial merely postpones coming to
> grips with the problem at the cost of engaging in a full-dress trial that is unnecessary
> for a just adjudication of the dispute. Therefore, when the only question is what
> legal conclusions are to be drawn from an established set of facts, the entry of a
> summary judgment usually should be directed. 10A Fed. Prac. & Proc. Civ. § 2725
> (4th ed.)

A court shall grant summary judgment on a claim when the moving party establishes that

there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). No genuine issue of fact exists if the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). A "scintilla of evidence" or evidence that is merely

"colorable or not significantly probative" does not present a genuine issue of material fact. *United*

*Steelworkers of Am. v. Phelps Dodge Corp*, 865 F.2d 1539, 1542 (9th Cir. 1989), *cert denied*, 493

U.S. 809 (1989) (citation omitted). A genuine issue of fact exists only "if the evidence is such that

a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In cases tried to a jury, the court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir. 1999) (citation omitted). However, pursuant to the Suits in Admiralty Act, 46 U.S.C. § 30903(b), an admiralty action against the United States must be tried to the court, sitting without a jury. In a non-jury case, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *Jones v. United States*, 936 F.3d 318, 321–22 (5th Cir. 2019). As such, "[w]hen deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.*

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of their case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 649 (5th Cir.1992). Rather, the non-moving party must come forward with competent evidence, such as affidavits or depositions, to buttress its claims. *Id*. The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

As the record will show, all facts point to liability being borne entirely by parties other than Cobalt and AWS. There has not been a scintilla of evidence developed during the course of discovery to support a finding that the Vessel was defective and/or unreasonably dangerous, or

that such condition caused or contributed to cause this accident, such that liability could attach to Cobalt and/or AWS for the July 24, 2016 accident. The only evidence that can be considered by this Court shows that Cobalt and AWS are not liable, thereby demonstrating the absence of a genuine issue of material fact.  At the time this motion is being filed, discovery is closed, expert witness reports are exchanged, rebuttal expert witness opinions are exchanged, and all expert witnesses have been deposed. At the close of all those proceedings, there is no evidence that either Cobalt or AWS caused or contributed to cause this accident. For these reasons, it is appropriate to grant summary judgment in favor of both Cobalt and AWS, and to exonerate these parties from all claims associated with the July 24, 2016 accident.

## II.   MR. DARLAND'S ACTS AND OMISSIONS CAUSED THIS ACCIDENT

Mr. Darland's negligent vessel operation and violations of the Inland Navigation Rules was the sole cause of the July 24, 2016 accident.

### a.  *Mr. Darland was an experienced boater at the time of the accident, was familiar with Lake Powell, and was familiar with the dangers associated with traveling outside the marked channel.*

Mr. Darland was not a novice boat operator - quite the opposite.  He had been operating boats since 1994 or 1995.[1]  Further, Mr. Darland owned a 38-foot Hustler, which is capable of reaching speeds of 80 mph, since 2004.[2] During the 20+ years he operated boats, he took no formal boating safety classes or navigational training courses.  Instead, Mr. Darland testified that he learned about boater safety through experience and being on the water.[3] Because of that

---

[1] Exhibit 1, 31:14-19
[2] Exhibit 1, 39:4-25
[3] Exhibit 1, 58:13-22

experience, Mr. Darland acknowledged that he was aware that safe boating speeds should reflect applicable water conditions, weather conditions, and lighting conditions.[4]

Aside from his general boating knowledge and experience, Mr. Darland had actual experience boating on Lake Powell, having operated on the lake at least once a year since purchasing the 38-foot Hustler in 2004.[5] In fact, on June 24, 2016, approximately one month prior to the accident, Mr. Darland rented the Vessel from All-In Boat Rentals.  During that trip, Mr. Darland navigated in and out Bullfrog Bay, past the very island he would later strike on July 24, 2016, approximately four-five times. This would have also required Mr. Darland to use the very ATONs he chose to ignore on the night of the accident, approximately four-five times. Based on his experience navigating on Lake Powell, the uncontroverted material facts establish that Mr. Darland was aware of the following:

- That there were submerged or partially submerged features of Lake Powell outside of the marked channel;

- That hazards change from day to day on Lake Powell because of the water level;

- That not all hazards on Lake Powell were marked;

- That operators should slow the boat down when it was dark; and

- That operators need to keep a careful look-out on Lake Powell given the number of hazards.

---

[4] Exhibit 1, 64:9-66:10
[5] Exhibit 1, 53:9-54:20

Unfortunately, Mr. Darland chose to ignore these safe boating practices on July 24, 2016, resulting in his traveling outside the marked channel, too fast for conditions, at night, and without a proper look-out.

### b. *Renting the Vessel from All-In Boat Rentals.*

Mr. Darland, his two sons, Jennifer Decker, and her son arrived at the Lake Powell region on Saturday July 23, 2016. Mr. Darland made arrangements with All-In Boat Rentals to rent the Vessel for the second time in as many months. During the prior June 2016 visit, Mr. Darland inspected and reviewed the Vessel with All-In Boat Rentals wherein the basic features of the Vessel were explained.  When reviewing these features, All-In Boat Rentals admonishes all of its renters from operating at night because you cannot see and it is too dangerous.[6]  All-In Boat Rentals further informs all of its customers that not all hazards outside of the marked channel on Lake Powell are marked – a fact that Mr. Darland already knew.[7]  All-In Boat Rentals also advises its renters that when traveling outside of the marked channel, operators need to travel at a slower speed and keep a proper look-out – another fact that Mr. Darland was already aware of.[8]

To further assist its customers with navigation on Lake Powell, All-In Boat Rentals offers for purchase, a map commonly referred to as the "Stan Jones" map. When renting the Vessel from All-In Boat Rentals, Mr. Darland made the conscious decision to not purchase the Stan Jones map. In fact, he testified that he never used maps, choosing instead to rely solely on his memory.[9]  Before

---

[6] Exhibit 4, 184:10-25
[7] Exhibit 4, 143:9-14
[8] Exhibit 6, 100:16-25
[9] Exhibit 1, 241:18-242:19

departing, Mr. Darland took no actions to familiarize himself with Lake Powell, including reviewing any of the available information on the internet.[10]

### c.   *The 105 mile Voyage up lake from Wahweap to Seven Mile Canyon*

On July 24, 2016, Mr. Darland picked up the Vessel from All-In Boat Rentals at approximately 1:30 PM (MDT) and embarked from Wahweap Marina for a three-day trip on Lake Powell.  The Vessel departed Wahweap Marina with plans to meet friends anchored on a houseboat in Seven Mile Canyon, 105 miles away from Wahweap Marina, before they were going to stay the night at Bullfrog Marina located in Bullfrog Bay.

After making several stops while traveling up lake, the Vessel arrived in Seven Mile Canyon at approximately 7:00-7:30 PM (MDT).[11] Mr. Darland estimated that he was traveling approximately 50 mph when traveling up lake in the main channel.[12] Mr. Darland was aware that ATONs marked the main channel of Lake Powell, and testified that he adhered to the ATON system while traveling up lake to Seven Mile Canyon.  In the course of traveling from Wahweap Marina to Seven Mile Canyon, he passed Bullfrog Bay, the same location he passed several times one month prior.  Using his memory – in lieu of the map he chose not to purchase - he should have been aware of all relevant ATONs for his return trip.

### d.   *The July 24th Accident – "I thought we had about 30 minutes to get back!"*

Mr. Darland visited with friends in Seven Mile Canyon until approximately 9:00 PM (MDT) at which time they traveled down lake, back towards Bullfrog Bay.  He thought they had

---

[10] Exhibit 1, 47:24-48:7; 69:17-20
[11] Exhibit 5, pg. 3
[12] Exhibit 1, 132:19-22

about thirty minutes to get back, and it gradually became darker further down the channel.[13] Having just passed Bullfrog Bay earlier that evening, Mr. Darland was well aware of the ATONs, and the time it took to travel from Seven Mile Canyon to Bullfrog Bay.  Despite this knowledge, he decided to stay at the houseboat at Seven Mile Canyon until after sunset, which occurred at 8:39 PM. The moon did not rise until 11:47 PM, two hours after the accident (MDT).[14]

On the return trip to Bullfrog Bay, Mr. Darland was at the helm, Ms. Decker was seated in port cockpit seat, and the three boys were seated in the bow. B.D. was seated in the port bow seat, D.D. was seated in the center bow seat, and G.D. was seated in the starboard bow seat.[15]

Mr. Darland arrived at the mouth of Bullfrog Bay at approximately 9:30 PM (MDT), wherein he was reportedly traveling 25-30 mph, fifty-one minutes after the sun set. Based on his testimony, Mr. Darland intended to drive through the main channel and enter Bullfrog Marina using the Bullfrog Bay ATONs.[16] This would require him to use ATONs marked BF1, BF2, BF3, and BF4. Rather than travel from buoy 95 to buoy 94, and enter Bullfrog Bay at BF 1, he turned too early into Bullfrog Bay by turning starboard after buoy 95.[17] He then traveled toward the lights of Bullfrog Marina.  The path chosen by Mr. Darland placed the Vessel outside of the marked channel, with the shoreline just 300 yards to his starboard, and BF 1 more than 800 yards off his port side.[18]

---

[13] Exhibit 1, 144:3-17
[14] Exhibit 5, pg. 4
[15] Exhibit 5, pg. 4-5
[16] Exhibit 5, pgs. 39-40
[17] Exhibit 5, pgs. 39-40
[18] Exhibit 5, pg. 39

Shortly after Buoy 95, and well outside the marked channel, Mr. Darland struck an island exposed because of the water level, causing the three children to be ejected. Had Mr. Darland entered Bullfrog Bay using BF 1, he would have avoided the impact with the exposed island.[19]

### e. On July 24th, 2016 Mr. Darland was not a prudent mariner.

On the night of the accident, Mr. Darland's decisions were not those of a prudent mariner, and resulted in the accident and injury.

### i. Mr. Darland did not properly use the ATONs located on Lake Powell at the time of the accident.

On the night of the accident, the ATONs marking the safe channel were lit, on station, and easy to identify. Ranger Dallemolle traveled safely from the main river channel through Bullfrog Bay relying "solely" on the Bullfrog Bay ATONs in order to safely operate his vessel into Bullfrog Bay and arrived at Bullfrog Marina, Mr. Darland's intended destination.  He confirmed under oath that the Bullfrog Bay ATONs were on station with the lights functioning properly.  He believed that the first navigational aid within Bullfrog Bay was visible no less than one mile out, and potentially up to four miles away.[20]  He testified the three succeeding navigational aids, BF2-BF4, were immediately visible once he reached BF1.[21]  Ranger Dallemolle traveled at a high rate of speed, in the dark, and without the benefit of radar, GPS, or a map chart plotter, and was able to safety navigate and arrive at Bullfrog Marina.  Ranger Dallemolle properly followed the ATONs; Mr. Darland did not.

---

[19] Exhibit 5, pgs. 39-40
[20] Exhibit 3, 114:22-115:23
[21] Exhibit 3, 115:24-116:25

Rather than take the proper and prudent course demonstrated by Ranger Dallemolle, Mr. Darland inexplicably choose to take his own path, at night, after drinking alcohol, while traveling 25-30 mph, with no look-out.  There is no condition specific to the Vessel that affected Mr. Darland's conscious decision to ignore the ATONs, which were designed to provide a safe channel.  Had Mr. Darland simply followed the safe marked channel, as exhibited by Ranger Dallemolle, the accident would not have occurred. Given his prior experience in Bullfrog Bay, there is no excuse for his blatant disregard for the ATONs marking the safe channel.

### ii.  Mr. Darland was not proceeding at a safe speed under the prevailing circumstances and conditions in violation of the Inland Navigation Rules.

Rule 6 of the Inland Navigation Rules requires that boat operators maintain a safe speed under prevailing conditions. Rule 6 reads:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account: (a) By all vessels:
>
> (i) the state of visibility;
> (ii) the traffic density including concentration of fishing vessels or any other vessels;
> (iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
> (iv) at night, the presence of background light such as from shore lights or from back scatter of her own lights;
> (v) the state of wind, sea, and current, and the proximity of navigational hazards;
> (vi) the draft in relation to the available depth of water.

Mr. Darland testified that a safe speed when traveling in the dark is 10-15 mph. Under the prevailing circumstances, i.e. traveling after sunset, after consuming alcohol, and with the knowledge that there are unmarked hazards, Mr. Darland was not proceeding at a safe speed. By

traveling at a speed of 25-30 mph on Lake Powell on the night of July 24, 2016, Mr. Darland was

in violation of Rule 6 of the Inland Navigation Rules.[22] By traveling at a speed of 25-30 mph, Mr.

Darland did not proceed at a safe speed so that he could take proper and effective action to avoid

the collision and be stopped within a distance appropriate to the island and hazard.

### iii.  Mr. Darland failed to have a proper look-out in violation of the Inland Navigation Rules.

The Inland Navigation Rules also require that a proper look-out be maintained at all times.

Rule 5 of the Inland Navigation Rules reads:

> Rule 5: Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

Mr. Darland violated Inland Rule 5 by failing to maintain a proper look-out.  Mr. Darland

was traveling at night, at 25-30 mph, after consuming alcohol all day. The only other adult on the

Vessel at the time of accident was an intoxicated Jennifer Decker, whose experience operating

boats was limited. Ms. Decker did not know the number on the ATONs that led into Bullfrog Bay,

or what color they were,[23] nor did she know which side of the ATONs a boat is supposed to travel

when using the ATON system.[24]  Most importantly, Ms. Decker further stated that she was never

asked to serve as look-out on the night of the accident.[25]  The island Mr. Darland ultimately struck

was approximately two feet out of the water.  As captain of the Vessel, Mr. Darland's failure to

---

[22] Exhibit 5, pgs. 41-42
[23] Exhibit 2, 97:22-99:16
[24] Exhibit 2, 101:8-102:1
[25] Exhibit 2, 32:11-14

maintain a proper look-out, in combination with his failure to proceed at a responsible speed, caused the accident.[26]

## III.   THE VESSEL WAS NOT DEFECTIVE OR UNREASONABLY DANGEROUS

Products liability claims require proof of a defective product, which can include manufacturing flaws, design defects, and inadequate warnings regarding use. *Niemela v. Imperial Mfg., Inc.,* 2011 UT App 333, ¶ 8, 263 P.3d 1191, 1195. A plaintiff must prove three elements to succeed in a strict products liability suit: "(1) that the product was unreasonably dangerous due to a defect or defective condition, (2) that the defect existed at the time the product was sold, and (3) that the defective condition was a cause of the plaintiff's injuries. *Id.* It is clear that there is not a scintilla of evidence that a defective condition of the Vessel caused the injuries complained of.

The Utah Product Liability Act's standard for determining whether a product is defective, requires a plaintiff to prove that the product was unreasonably dangerous to the user or consumer at the time it was sold by the manufacturer or other initial seller. *Utah Code Ann. § 78B–6–703(1)* (2008). As defined by the Act, the standard for "unreasonably dangerous" focuses on consumer expectations:

> As used in this part, "unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

*Id.*

---

[26] Exhibit 5, pgs. 41-42

Further, the statute also creates a rebuttable presumption of nondefectiveness applicable to a product compliant with government standards:

> There is a rebuttable presumption that a product is free from any defect or defective condition where the alleged defect in the plans or designs for the product or the methods and techniques of manufacturing, inspecting and testing the product were in conformity with government standards established for that industry which were in existence at the time the plans or designs for the product or the methods and techniques of manufacturing, inspecting and testing the product were adopted.

*Niemela v. Imperial Mfg., Inc.*, 2011 UT App 333, ¶ 10, 263 P.3d 1191, 1196.

A plaintiff claiming negligence in a product defect context must prove the ordinary elements of negligence, including duty and causation. *Id.* at 1198. A parties failure to present evidence that, if believed by the trier of fact, would establish any one of the elements of the prima facie case justifies a grant of summary judgment. Id. at 1191.

In a claim for product defect, under either a theory of negligence or strict liability, proof is required that the defective product caused the accident. Any claim that the Vessel was defective and that it caused the accident is wholly unsupported by any evidence or testimony in this matter.

### a.  *No witness claims the Vessel caused or contributed to cause the accident.*

Despite Theut's and Gagliardi's claims against Cobalt and AWS pending in Maricopa County Superior Court in the State of Arizona, and the United States' claims in this matter, there is no fact evidence or opinion evidence to support a claim that the Vessel was defective, unreasonably dangerous, or a cause of this accident.

Mr. Darland testified that he felt the Vessel was in good condition and had all the equipment necessary for safe operation. Mr. Darland further testified that he did not think there was anything wrong with the Vessel that led to the accident. The only other adult on the Vessel at the time of the accident was Jennifer Decker. When asked under oath if she had any issues with

the Vessel, she replied "No".[27] When asked if she or Mr. Darland had issues with the children

riding in the bow, she replied that no one ever expressed a concern[28][29]. She also confirmed that

Mr. Darland never expressed any complaint regarding the Vessel.

> **b. No expert has opined that the Vessel was defective at the time of the accident or**
>
> **that it caused or contributed to cause the accident.**

Utah courts have not squarely decided whether a plaintiff can prove the existence of a

defect in a products liability action without expert testimony. *Blank v. Garff Enterprises Inc.*, 2021

UT App 6, ¶29, 482 P.3d 258, 266. But generally in cases involving "scientific matters beyond the

capacity of an ordinary juror," expert testimony is needed for plaintiffs to make out a prima facie

case. *Id.* In particular, expert testimony may be necessary in cases that involve trades or professions

that require specialized knowledge, "such as medicine, architecture, and engineering." *Id.*

The question of causation is generally reserved for the jury, but the district court "may rule

as a matter of law on this issue if there is no evidence to establish a causal connection, thus leaving

causation to jury speculation." *Id.* at 267 quoting *Niemela*, 2011 UT App 333, ¶ 22, 263 P.3d 1191.

"Utah courts generally require expert testimony to prove causation in tort cases in all but the most

obvious cases." *Blank*, 2021 UT App 6, ¶29, 482 P.3d at 267 quoting *Ladd v. Bowers Trucking,*

*Inc.*, 2011 UT App 355, ¶ 10, 264 P.3d 752. Whether "a plaintiff may be excepted from the

requirement of using expert testimony to prove causation" often depends on the nature of the

injury. *See Niemela*, 2011 UT App 333, ¶ 22, 263 P.3d 1191.

---

[27] Exhibit 2, 110:25-111:1
[28] This is evidenced by the fact that since the accident, there is documented proof
that D.D. and G.D. have sat in the bow of a boat while it was underway.
[29] Exhibit 2, 114:22-115:14

United States of America, mimicking Theut's and Gagliardi's claims against Cobalt/AWS in the Maricopa County case, claims that any alleged damages were the proximate result of Cobalt/AWS's fault, negligence, acts, omissions, and breaches of duty in the following respects: failure to properly and safely design, install, inspect and label the Vessel, its propulsion system and any safety mechanisms and component parts; by its failure to provide the Vessel with a non-defective and reasonably safe propeller system and safety guard for the propellers; by its failure to properly label and/or supply warning labels and other appropriate or adequate warnings and instructions to prevent the accident; and by its failure to use and/or adopt a reasonable alternative design which could have reduced or eliminated the foreseeable risk of harm, the omission of which rendered the product not reasonably safe. [ECF 225 and 226]. These claims are of the very nature that require specialized knowledge and training reserved solely for an expert witness.

After more than two years of fact and expert discovery, and after all parties have had a full and fair opportunity to litigate, there is no evidence to support any claim that some act or omission on the part of Cobalt and/or AWS caused or contributed to cause this accident. None of the parties have proffered any expert opinions that are critical of the Vessel in this action.  The uncontradicted opinions and testimony of Cobalt's and AWS' retained experts prove that the Vessel was not defective, was not unreasonably dangerous, and that it did not cause or contribute to cause this accident.[30] Without expert witnesses showing otherwise, there is no basis for finding Cobalt and/or AWS liable for the accident.

---

[30] Exhibit 5

### c. The Vessel conformed with all applicable government and industry standards at the time of the accident.

Further, the Tenth Circuit Court of Appeals has addressed a case with strikingly similar facts.  In *Allen*, the plaintiff ("Allen") went for a boat ride after dark on the Utah portion of Lake Powell.  *Allen v. Minnstar,* 8 F.3d 1470, 1472 (10th Cir. 1993). Allen was sitting in the front of the boat when the driver of the boat made a sharp turn, causing Allen to fall overboard. *Id.* The boat ran over Allen, who was struck and injured by the boat's unguarded propeller.  *Id.* In addition to other injuries, Allen's leg was amputated above the knee. *Id.* Allen alleged that various defendants were liable because the boat was defectively designed and unreasonably dangerous for not being equipped with a propeller guard by such defendants. *Id.*  Summary judgment was granted in favor of the boat manufacturers by the District Court of Utah based upon the following reasoning:

> **This court is unwilling to set a new precedent in products liability law by imposing liability on manufacturers whose products conform to the safety standards of the industry, but do not incorporate every possible safety feature regardless of cost or effect on performance of the manufacturer's product.** *Id.* at 1473.  (emphasis added).

The Tenth Circuit upheld the lower court's summary judgment ruling.  The court in *Allen* held that under strict product liability claim, the party must show that at the time of the injury an "alternative, safer design, practicable under the circumstances existed. *Id.* at 1479; see also *Peterson v. Raymond Corp.*, 994 F.3d 1224, 1226 (10th Cir. 2021). The court in *Allen* placed significant reliance upon *Elliott v. Brunswick Corp.* 903 F.2d 1505 (11th Cir. 1990). The Eleventh Circuit in *Elliott* reversed the District Court's judgment, concluding that a boat motor manufacturer was not liable to a juvenile on a product liability theory for the juvenile's injuries suffered from impact by a boat propeller that did not have propeller guards.  "The Eleventh Circuit held that

when [the plaintiff] failed to demonstrate the existence of a safer, practical propeller guard for use on planning pleasure boats as required by Alabama law, she failed to establish a products liability or negligence claim." *Id.* at 1510*.*

The *Allen* Court also referenced *Wheeler v. John Deere Co.*, which succinctly summarized *Elliott* as standing for the proposition that the danger of a rotating boat propeller was sufficiently obvious and with cognition to preclude imposition of §402A liability upon the manufacturer of an outboard motor. *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1104 (10th Cir. 1991).

As stated *supra*, Ms. Decker was one of the passengers aboard the Vessel on the day of the accident.  Ms. Decker has experience as a boat passenger, but almost none as a boat operator on Lake Powell, or specifically in Bullfrog Bay.  Even with this limited boat operation experience, Ms. Decker knew that boat propellers are sharp[31], rotate very rapidly[32], and that contact with a boat propeller when rotating can cause injury.[33]  Ms. Decker knew that you should not get close to any boat propeller, regardless of whether it was idle or propelling.[34]  However, there was nothing about this particular boat propeller that made it any more dangerous than any other boat propeller.  In fact, Mr. Darland had no concern about his safety while on the Vessel.[35]  Quite simply, there are no facts that can be advanced by any party that would demonstrate that Cobalt and/or AWS is at fault for this accident.

The plaintiffs in *Allen* and *Elliott* failed in their claims because, among other reasons, they presented no feasible, safer, alternative design that would have made the boat safer.  As stated

---

[31] Exhibit 2, 127:8-12
[32] Exhibit 2, 126:24-127:7
[33] Exhibit 2, 127:18-25
[34] Exhibit 2, 128:1-8
[35] Exhibit 2, 130:5-11

*supra*, the discovery ship has sailed.  After more than two years of discovery, there is no evidence of an alternative design for this Vessel, nor has any party argued that Cobalt and/or AWS violated any industry standard in their production of the Vessel.

It is a fact that the uncontroverted opinions of Cobalt's and AWS' experts prove that the Vessel was certified by NMMA and built in accordance with ABYC standards.[36] The ABYC develops safety standards for the design, construction, equipage, maintenance, and repair of the small craft and their systems. Cobalt has certified their boats to be ABYC and NMMA compliant, including the Vessel, and in doing so, demonstrates compliance with marine industry best practices. This compliance includes, field of visibility from the helm, bow riding, and warnings.

Given the complete lack of expert testimony even suggesting that the Vessel was defective, the uncontroverted opinions of Cobalt's and AWS' experts, and the uncontroverted opinions that the Vessel complied with all government and industry standards, the proof shows the Vessel was not defective, was not unreasonably dangerous, and did not cause or contribute to cause this accident.  Given the absence of any evidence that would demonstrate liability on Cobalt and AWS, summary judgment is appropriate for all claims arising out of the July 24, 2016.

## CONCLUSION

On July 24, 2016, with three minor children in the Vessel, Mr. Darland chose to travel outside of the marked channel, at night, while traveling 25-30 mph, with no look-out, and after consuming alcohol all day. When combined, the negligent acts of Mr. Darland on July 24, 2016 caused the accident.

---

[36] Exhibit 5

Even more, there is not a single piece of evidence establishing liability on Cobalt and/or AWS.  Cobalt manufactured the Vessel at issue while AWS sold it within the stream of commerce. After the close of all discovery, there is not a scintilla of evidence proving that the Vessel was defective, unreasonably dangerous, or that it causes or contributed to cause the accident at issue.

WHEREFORE, for the reasons stated herein, Cobalt Boats, LLC and AWS Boats, LLC pray that the Court sustain their Joint Motion for Summary Judgment and enter judgment in their favor for all claims arising out of the July 24, 2016 accident.

Dated this 26th day of May, 2021,

SNOW CHRISTENSEN & MARTINEAU

/s/ Adam M. Pace
Andrew M. Morse
Adam M. Pace
*Attorneys for Cobalt Boats, LLC and*
*AWS Boats, LLC*

BROWN & JAMES, P.C.
/s/ Bradley R. Hansmann
Bradley R. Hansmann
Daniel P. Hunkins
*Attorneys for Cobalt Boats, LLC and*
*AWS Boats, LLC*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served electronically with the U.S. District Court of the State of Utah by using the CM/ECF system.  I certify that all parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system

Timothy B. Smith
Jones Waldo Holbrook & McDonough
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
tsmith@joneswaldo.com
***Attorneys for Claimants Paul J. Theut, Guardian Ad Litem for D.D. and G.D***

J. Tyrrell Taber
Barbara Montano
BURG SIMPSON
2398 E. Camelback Road, Suite 1010
Phoenix, AZ 85016
ttaber@burgsimpson.com
bmontano@burgsimpson.com
***Attorneys for Claimants Paul J. Theut, Guardian Ad Litem for D.D. and G.D.***

William L. Banning
Rebecca Rojas
Banning, LLP
P.O. Box 9600
Rancho Santa Fe, CA 92067
wbanning@banningllp.com
rrojas@banningllp.com
***Attorneys for Claimants Paul J. Theut, Guardian Ad Litem for D.D. and G.D.***

Michael D. Padilla
THE PADILLA LAW GROUP, LLP
320 Encinitas Blvd., Ste. A
Encinitas, CA  92024
padilla@padillalawgroup.com
***Attorneys for Claimants Paul J. Theut, Guardian Ad Litem for D.D. and G.D.***

John R. Lund

Burt Rosenblatt
Alicia Funkhouser
Ely Bettini Ulman Rosenblatt & Ozer
3200 N. Central Avenue, Suite 1930
Phoenix, AZ 85012
afunkhouser@eburlaw.com
***Attorneys for Tara Galiardi***

Andrew G. Deis
Deiss Law, P.C.
10 W. 100 S., Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
***Attorneys for Tara Galiardi***

John W. Huber
John K. Mangum
U.S. Department of Justice
111 S. Main Street, Suite 1800
Salt Lake City, UT 84111
John.huber@usdoj.gov
John.mangum@usdoj.gov
***Attorneys for Limitation Plaintiff U.S. of America***

R. Michael Underhill
Eric Kaufman-Cohen
Frank J. Anders
Aviation, Space, & Admiralty Litigation
Torts Branch, Civil Division, West Coast Office
U.S. Department of Justice
P.O. Box 36028
450 Golden Gate Avenue, Room 7-5395
San Francisco, CA 94102
Mike.underhill@usdoj.gov

Katherine E. Venti
Alan S. Mouritsen
Parsons Behle & Latimer
201 S. Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, UT 84145
jlund@parsonsbehle.com
ecf@parsonsbehle.com
**Attorneys for Aramark Sports & Entertainment**

Terence S. Cox
Cox Wootton Lerner Griffin & Hansen, LLP
900 Front Street, Suite 350
San Francisco, CA 94111
tcox@cwlfirm.com
**Attorneys for Aramark Sports & Entertainment**

Lara A. Swensen
James Dodge Russell & Stephens, P.C.
10 W. Broadway, Suite 400
Salt Lake City, UT 84101
lswensen@hjdlaw.com
**Attorneys for Jeffrey Darland**

Christopher A. Abel
Wilcox & Savage, PC
440 Monticell Ave., Suite 220
Norfolk, VA 23510
cabel@wilsav.com
**Attorneys for Jeffrey Darland**

Eric.kaufman-cohen@usdoj.gov
Franklin.j.anders@usdoj.gov
**Attorneys for Limitation Plaintiff U.S. of America**

Phillip S. Lott
John W. Holt
Litigation Division
Utah Attorney General's Office
160 East 300 South, 6th Floor
P.O. Box 140856
Salt Lake City, UT 84114
phillott@agutah.gov
jholt1@agutah.gov
**Attorneys for the State of Utah**

R. Blake Hamilton
Durham Jones & Pinegar, P.C.
111 S. Main Street, Suite 2400
P.O. Box 4050
Salt Lake City, UT 84110
Bhamilton@djplaw.com
**Attorneys for Kane County, Utah**

Patrick X. Fowler
Alexix G. Terriquez
SNELL & WILMER, LLP
400 E. Van Buren, Ste. 1900
Phoenix, AZ 85004
pfowler@swlaw.com
aterriquez@swlaw.com
**Attorneys for Mercury Marine, Inc. and Brunswick Corporation**

*/s/ Adam M. Pace*
_____